# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| MARZETTA DENNIS, | : |
| Plaintiff, | : 5:05-CV-07 (CAR) |
| vs. | : |
| PUTNAM COUNTY SCHOOL DISTRICT, WILLIAM GILBERT, and GEORGIA SMITH, both in their individual and official capacities, | : |
| Defendants. | : |

## ORDER

Currently before the Court are Defendant William Gilbert's Motion for Summary Judgment [Doc. 34], Defendant Georgia Smith's Motion for Summary Judgment [Doc. 36], Defendant Putnam County School District's Motion for Summary Judgment [Doc. 44] (collectively "Defendants"), Plaintiff Marzetta Dennis's ("Plaintiff") Motion for Summary Judgment [Doc. 35], and her Motion to Strike [Doc. 74].

For the reasons discussed below, the Court **GRANTS** Defendants' Motions for Summary Judgment [Docs. 34, 36, & 44], **DENIES** Plaintiff's Motion for Summary Judgment [Doc. 35], and **DENIES** Plaintiff's Motion to Strike [Doc. 74].

### Factual Background

Plaintiff brings this First Amendment[1] retaliation action against Putnam County School District ("School District"), William Gilbert, the Director of the Head Start Program ("Head

---

[1] In her Complaint, Plaintiff alleges violations of the United States Constitution, as well as the Georgia Constitution. In construing the Georgia free-speech clause, the Georgia Supreme Court applies analogous First Amendment standards in the absence of controlling state precedent. See generally Jones v. Bd. of Regents, 585 S.E.2d 138 (Ga. Ct. App. 2003).

Start" or "Program"), and Georgia Smith, the Chairman of the Head Start Policy Council ("Policy Council" or "Council"), contending that Defendants demoted and, subsequently, constructively terminated her because she spoke out regarding the financial mismanagement of Putnam County's Head Start Program. Construed in the light most favorable to Plaintiff, the record establishes the following facts. See Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 918, 918-919 (11th Cir. 1993) (stating that for summary judgment purposes, the court must view the facts in the light most favorable to the non-moving party and draw all favorable inferences in favor of that party).

Plaintiff began her employment with the Putnam County Head Start Program as its Fiscal Officer on July 31, 2002. The Head Start Program is a state and federally-funded public program that provides comprehensive child and family development services for low-income families. Since the Program's inception, Defendant Gilbert has served as the Program's Director, with the Fiscal Officer reporting directly to him. The Policy Council, made up of two parents and three citizens of Putnam County, oversees the Program's operations. At the time relevant to this action, Georgia Smith served as the Council's Chairman. The Putnam County Board of Education ("Board") is Head Start's fiscal agent and is charged with the responsibility of monitoring Head Start's revenues and expenditures.

As Head Start's Fiscal Officer, Plaintiff essentially performed bookkeeping functions. Among other things, she maintained budgets, completed tax reports, reconciled bank statements, approved purchase orders, and calculated monthly travel vouchers. Shortly after Plaintiff began her employment, she observed what she perceived to be financial mismanagement. Specifically, Plaintiff alleges Defendant Gilbert and his executive assistant spent monies without Plaintiff's

2

knowledge; they collected monies from parents for graduation regalia without issuing receipts and received kickbacks from the sales; they used federal funds to purchase cleaning supplies from an disreputable vendor and Christmas gifts for members of Council; they overspent the budget; and they denied allotted mileage and tuition reimbursement to qualifying staff.

In the early months of 2003, Plaintiff voiced her concerns to Defendant Gilbert and his executive assistant. Defendant Gilbert, however, ignored Plaintiff's concerns, stating that "[he] is] the Director of Putnam County Head Start and [he] will run Head Start as [he] sees fit." (Pl.'s Ex. 3, at 1.) Disappointed with Mr. Gilbert's reaction, Plaintiff then voiced her concerns to three members of the Policy Council and Dr. McWilliams, then the Board's Superintendent. Superintendent McWilliams advised Plaintiff to, once again, discuss her concerns with Defendant Gilbert.

Following Superintendent McWilliams's directive, on March 12, 2003, Plaintiff outlined her concerns in a letter entitled "Accountability of Federal and State Funds" and delivered it to Defendant Gilbert, Defendant Smith, and Superintendent McWilliams. (Pl.'s Ex. 3, at 1.) In the letter, Plaintiff accused Defendant Gilbert of misappropriation and overexpenditure of funds. Notably, Plaintiff also acknowledged that reporting such misconduct was part of her job description.

The letter launched the course of events that eventually lead to Plaintiff's resignation, and ultimately, to this lawsuit. Immediately upon receiving the letter, Defendant Smith called a meeting of the Policy Council to discuss Plaintiff's allegations. The Policy Council met on March 15, 2003, with Plaintiff and Defendant Gilbert in attendance, and voted to suspend Plaintiff because she failed to follow the proper channels for alleging financial mismanagement.

3

(Pl.'s Ex. 4.)  Wishing to discuss its decision further with Superintendent McWilliams, the Council postponed the effective date of Plaintiff's suspension and agreed to reconvene on March 17, 2003.

Before the meeting on the 17th, Defendant Gilbert's executive assistant, while collecting financial information from Plaintiff's office, found a travel reimbursement request belonging to Plaintiff.  From the face of the document, it appeared that Plaintiff added nearly $400.00 to a request that had already been approved by Defendant Gilbert and Superintendent McWilliams, and had cut herself a check for the augmented amount.

The executive assistant brought the allegedly forged document to the March 17th Council meeting, which the Superintendent was unable to attend.  After further discussion of Plaintiff's allegations, the presentation of evidence to rebut those allegations, and familiarization with the forged travel voucher, the Council voted to terminate Plaintiff's employment.  The termination notice, drafted at the end of the meeting, listed the ground for termination as "violation of the rules set in the Policies and Procedures Manual of the Putnam County Head Start Program."  (Pl.'s Ex. 6.)

Shortly thereafter, however, the School Board decided that the Policy Council lacked the authority to terminate an employee and rejected the termination pending an investigation to be conducted by Superintendent McWilliams.  In the meantime, to prevent a conflict between Plaintiff and Defendant Gilbert, the Superintendent transferred Plaintiff to the Board Offices to be his personal administrative assistant.

The Superintendent continued to investigate Plaintiff's allegations, and on one occasion, he met with Plaintiff and her predecessor, Gayle Tidwell, and requested both Fiscal Officers to

4

write up a confidential list of concerns about the Head Start Program. Though the Superintendent promised to keep the lists confidential, Plaintiff somehow obtained a copy of Ms. Tidwell's confidential statement and gave it to a former Council member. Feeling betrayed, on September 11, 2003, the Superintendent attended a Board of Education Meeting where he recommended Plaintiff's suspension, without pay, for two weeks for disclosing her co-worker's confidential information to the public. The Board of Education accepted his recommendation and suspended Plaintiff. Two weeks later, on September 24, 2003, Plaintiff resigned, stating that she was a "scapegoat for telling the truth," and threatening to file the present lawsuit.

## Discussion

### I. Motion to Strike

Preliminarily, Plaintiff moves to strike certain declarations of Defendant Gilbert, Diane Bledsoe, and Martin Fierman, and portions of the affidavits of Defendant Smith, Marie Little, and Patti Swymer from consideration by this Court because they contradict prior testimony, are not based on personal knowledge, and contain conclusory allegations. However, because these portions of the record do not bear on the Court's disposition of the Motions for Summary Judgment, the Court **DENIES**, without prejudice, Plaintiff's Motion to Strike.

### II. Summary Judgment

#### A. *Summary Judgment Standard*

The summary-judgment rule exists "to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

. . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp., 477 U.S. at 322. A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, a court must review all the evidence in the record while "draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see also Maynard v. Williams, 72 F.3d 848, 851 (11th Cir. 1996).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and entitle it to a judgment as a matter of law. Celotex Corp., 477 U.S. at 323 (internal quotation marks omitted). If the moving party discharges this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(e); Celotex Corp., 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Under this scheme, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial." Celotex Corp., 477 U.S. at 322.

   *B. Analysis*

Plaintiff contends that she was demoted and constructively discharged in retaliation for her expression of speech that is protected by the First Amendment. For a public employee to sustain a claim of retaliation, she must, as an initial matter, establish that her speech is protected. Traditionally, to establish that the speech is protected, the employee had to show that (a) the speech addressed a matter of public concern, and that (b) the employee's interests as a citizen outweighed the interests of the State as an employer.[2] See, e.g., Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989) (citing Pickering v. Bd. of Regents, 391 U.S. 563, 568 (1968)). However, the Supreme Court, in Garcetti v. Ceballos, 126 S. Ct. 1951 (2006), added a new element to the traditional analysis. The Garcetti Court held that the First Amendment does not protect an employee's speech if the speech was made pursuant to the employee's official duties. Id. at 1960 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). In Court's view, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Id. at 1958. "Restricting speech that owes its existence to a public employee's professional responsibilities . . . reflects the exercise of employer control over what the employer itself has commissioned or created." Id. Therefore, after Garcetti, for a public employee's speech to be protected by the First Amendment, the employee must, in addition to

---

[2] These elements are determined as a matter of law by the court. See Anderson v. Burke County, 239 F.3d 1216, 1219 (11th Cir. 2001) (internal quotations omitted).

7

establishing the traditional elements of Pickering, show that her speech was *not* made pursuant to her official employment duties. In the instant case, before analyzing whether Plaintiff has established the Pickering elements, the Court will first determine whether Plaintiff made her disclosures[3] of financial irregularities pursuant to her official duties as the Fiscal Officer.

Because the parties in Garcetti agreed that the employee's speech was made pursuant to the employee's employment duties, the opinion provides little guidance as to what criteria a court should consider when determining the scope of an employee's duties. The Court advises that "the proper inquiry is a practical one," and cautions that a formal job description is "neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Id.

In this case, the Court finds that reporting financial irregularities was part of Plaintiff's job. As the Fiscal Officer, Plaintiff, among other things, paid bills, requested funds, approved purchase requisitions and purchase orders, reconciled bank statements, maintained accurate cash disbursement journals, and, generally, ensured that all aspects of the fiscal operation were carried out efficiently on a day-to-day basis. Plaintiff's disclosures related to the preparation and payment of purchase orders for supplies, overspending in the Office of School Readiness Fund, the inappropriateness of a request to transfer funds from a federal account to a state account and vice-versa, the need to replenish $1,293.28 drawn from a Board of Education account, accounting procedures and accountability, and Defendant Gilbert's attitude regarding the same—all matters within the scope of Plaintiff's employment as Head Start's Fiscal Officer.

---

[3] Plaintiff enumerates several instances of "speech," including her conversations with Council members and the Superintendent, as well as her letter addressed to Defendant Gilbert. However, because all of the instances relate to the allegations of financial mismanagement, the Court will refer to them, collectively, as "disclosures."

Moreover, Plaintiff admits, first in her March 12th letter[4] and subsequently in her deposition testimony,[5] that monitoring and reporting financial misconduct was part of her job. The "practical inquiry," therefore, leads this Court to conclude that Plaintiff's disclosures were made pursuant to her official duties as the Fiscal Officer of the Head Start Program.

The Court's foregoing finding is further supported by binding circuit precedent. Recently, the Eleventh Circuit held that reporting fraud falls within a financial counselor's scope of employment, and is therefore not protected by the First Amendment. Battle v. Bd. of Regents, 468 F.3d 755, 761-762 (11th Cir. 2006). In Battle, the plaintiff was a financial aid counselor at a state university. Shortly after starting, the plaintiff began to observe and document what she believed to be fraudulent practices in the Federal Work Study Program. She took notes and made copies of suspicious documents, storing them at home. Nearly ten years later, the plaintiff received an unfavorable performance review. Dissatisfied with the review, she met with a supervisor and informed the supervisor that she was aware of some ongoing fraudulent activity, and threatened to report her findings to the appropriate authorities unless changes were made. Shortly after that, the plaintiff received notice that her contract would not be renewed. She then

---

[4] In her letter, Plaintiff states that "[a]s Fiscal Officer/Bookkeeper, I have the fiduciary responsibilities of accounting for all Head Start funds and reporting what I perceive [to be] waste or misuse." (Pl.'s Ex. 3, at 1.)

[5] Plaintiff's deposition transcript contains the following exchange:
Q: Your concern about whether the supplies that were being purchased were all part of Head Start and were being used for Head Start, that was your responsibility as fiscal officer to raise those issues, right?
A: Yes, Sir. (Pl.'s Dep. 229:4-229:9.)
. . .
Q: You just mentioned that your job was to monitor federal funds and state funds. Is that essentially what you were doing when you complained about all of these things?
A: In a sense, yes.
Q: What do you mean, "in a sense"?
A: I was – I was monitoring the spending of those funds, I was responsible for how those funds were spent and any improprieties in the spending that I noted.
Q: So you were doing your job?
A: Some of my job I was doing. (Pl.'s Dep. 255:19-256-5.)

9

filed suit, alleging that she was discharged in violation of the First Amendment for reporting her concerns. The Eleventh Circuit panel, relying in part on the plaintiff's own admission that reporting fraud was part of her job, held that reporting fraud was part of plaintiff's duties and therefore not protected by the First Amendment. Id. at 760-762. The facts of the case at bar are virtually identical to Battle. Plaintiff, like the plaintiff in Battle, worked in a financial office of an educational institution. She similarly observed what she believed to be fiscal mismanagement and improprieties, and similarly admitted that reporting mismanagement was part of her professional duties. Therefore, her disclosures are similarly unprotected by the First Amendment.

The triviality of Plaintiff's speech further bolsters the Court's finding that her speech is not protected by the First Amendment. Among other things, Plaintiff claimed that Defendant Gilbert and his executive assistant unlawfully spent federal funds on personal use items such as dog bones, towels, and cleaning supplies. Plaintiff further alleged that Defendant Gilbert overdrew one of the accounts by $1,293.28. While not insignificant, Plaintiff's allegations certainly concern a lesser degree of fraud than the allegations of fraud found to be without protection in Battle (where the plaintiff accused another employee of making improper financial aid awards worth thousands of dollars and falsifying information in student files).

To defeat summary judgment, Plaintiff argues that finding her disclosures to be without First Amendment protection would deter public employees from exposing employers' misconduct. However, the Supreme Court, in a response to a similar concern raised by the Garcetti plaintiff, reasoned that public's interest was sufficiently protected by other means, including a "powerful network of legislative enactments–such as whistle-blower protection laws

and labor codes," such that extending First Amendment protection to "expressions employees make pursuant to their professional duties" is unnecessary. Garcetti, 126 S. Ct. at 1962; see also Battle, 468 F.3d at 761 (citing Garcetti, 126 S. Ct. at 1962).

Having found that reporting financial improprieties was part of Plaintiff's duties as the Fiscal Officer of the Head Start Program, the Court concludes that Plaintiff's disclosures are not protected by the First Amendment; Plaintiff's retaliation claim, therefore, fails as a matter of law.

## Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' Motions for Summary Judgment [Docs. 34, 36, & 44], **DENIES** Plaintiff's Motion for Summary Judgment [Doc. 35], and **DENIES** Plaintiff's Motion to Strike [Doc. 74].

**SO ORDERED,** this 21st day of March, 2007.

                                                                    S/ C. Ashley Royal
                                                                    C. ASHLEY ROYAL
                                                                    UNITED STATES DISTRICT JUDGE

EHE/jab